## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KLICOS PAINTING COMPANY, INC.,      *

     Plaintiff/Counter-Defendant,      *

v.      *      Civil No. RDB-15-2505

SAFFO CONTRACTORS, INC.,      *

     Defendant/Counter-Plaintiff.      *

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

### MEMORANDUM OPINION

On July 29, 2013, the Maryland Transportation Authority ("MDTA") awarded the Defendant/Counter-Plaintiff, Saffo Contractors, Inc. ("Saffo"), a contract to repair and paint various highway bridges on I-95 and I-395 in Baltimore just south of Oriole Park at Camden Yards and M&T Bank Stadium ("the 395 Project" or "the Project"). Saffo and the Plaintiff/Counter-Defendant, Klicos Painting Company ("Klicos"), arranged to perform the work together, but the parties disagree as to the terms of that arrangement. Specifically, George Klicos and his cousin Nick Saffo had fundamental disagreements with respect to the relationship of their companies, which ultimately led to this litigation. As a result of their joint efforts in 2014, Saffo paid Klicos $2,738,600.73. The parties have made competing claims that this amount constitutes unjust enrichment when compared to the value of the work Klicos performed on the 395 Project. Saffo further contends that Klicos secured $200,000 of the $2,738,600.73 by knowingly misrepresenting its intention to return to work after the winter holiday season in December of 2014.

As one witness observed, "everybody wanted to be the lead man on the job." (Tr. at 802.) It is undisputed, however, that Saffo was the General Contractor to which MDTA had awarded the contract for the 395 Project. Klicos was a cleaning and painting subcontractor that supplied about 45.47% of the cleaning and painting production hours in 2014.[1] When Klicos learned that Saffo was not going to include it on another project in Texas, the relationship soured. Ultimately, Klicos sought additional payments without completing any cleaning or painting work in 2015.

After a seven-day bench trial concluding on June 26, 2018, and for the reasons set forth below, this Court concludes as follows.

1. Klicos intentionally misrepresented its intent to return to the 395 Project in 2015, which caused Saffo to incur $200,000 in actual damages. Punitive damages are warranted in the amount of **$50,000.**

2. Klicos retains **$8,377.04** in unjust enrichment based upon Saffo's overpayment for the actual value to Saffo of Klicos' work on the 395 Project. This amount incorporates a deduction for a refund of the $200,000 fraudulently obtained by Klicos.

3. Judgment shall be ENTERED in favor of Saffo on its intentional misrepresentation claim and on the parties' competing claims of unjust enrichment.

4. Klicos SHALL PAY to Saffo a total of **$58,377.04**.

Pursuant to Federal Rule of Civil Procedure 52(a), the following memorandum constitutes this Court's findings of fact and conclusions of law.

---

[1] The 45.47% is based on a comparison of the parties' detailed payroll records for hourly employees working on-site. *See infra.*

# PROCEDURAL BACKGROUND

Klicos filed suit against Saffo on August 24, 2015. (ECF No. 1.) Saffo answered with counter-claims on September 28, 2015. (ECF No. 11.) Klicos answered the counter-claims on October 14, 2015 (ECF No. 13), and filed an Amended Complaint on June 16, 2016 (ECF No. 35). Saffo amended its Answer and Counterclaim. (ECF No. 31.) At that stage, Klicos' claims included breach of contract, unjust enrichment, and quantum meruit. (ECF No. 35.) Saffo's claims included unjust enrichment, conversion, replevin, detinue, fraud – intentional misrepresentation (including punitive damages), negligent misrepresentation, and, in the alternative, breach of contract. (ECF No. 31-1.)

On April 21, 2017, Saffo moved for summary judgment. (ECF No. 76.) On June 30, 2017, Klicos moved for partial summary judgment, challenging all claims except for portions of Saffo's breach of contract claim. (ECF No. 98.) On September 6, 2017, Judge J. Frederick Motz of this Court granted in part and denied in part both parties' motions. (ECF Nos. 105, 106.) Specifically, Judge Motz granted Saffo's motion for summary judgment as to Klicos' breach of contract and quantum meruit claims, and denied the motion as to the unjust enrichment claim. (*Id.*) Klicos' motion was granted as to Saffo's claims for conversion, replevin, detinue, negligent misrepresentation, contract damages related to a recycling unit and delayed performance, and for attorneys' fees. (*Id.*) Klicos' motion was denied as to Saffo's claims for unjust enrichment and intentional misrepresentation, including punitive damages. (*Id.*)

Based on the overlapping nature of the parties' unjust enrichment claims, Judge Motz held that the recovery for the competing unjust enrichment claims would be "measured by

'the actual value realized by the defendant,' and not the market value of the plaintiff's services rendered." (ECF No. 105 at 9 (citing *Dolan* v. *McQuaide,* 215 Md. App. 24, 37-38 (Md. Ct. Spec. App. 2013)).) More specifically, "the operative question will be whether the actual value realized by Saffo for Klicos's work is more or less than $2,738,600.73." (ECF No. 105 at 10.) Judge Motz also stated that Klicos' "expert report outlining Saffo's profits can be used, in conjunction with other witness testimony, to infer the value provided to Saffo by Klicos' work." (*Id.*)

On February 23, 2018, this case was reassigned from Judge Motz to the undersigned. On April 13, 2018, this Court clarified Judge Motz' prior summary judgment ruling and held that the prior entry of summary judgment in Saffo's favor on Klicos' breach of contract claim was limited to the non-existence of a contract on November 21, 2013. (ECF Nos. 122-23.) This decision enabled Klicos to press a breach of contract claim at trial only if Saffo elected to pursue its own breach of contract claim at trial. On April 27, 2018, however, Saffo informed this Court that it would not pursue a breach of contract claim at trial. (ECF No. 129.) The following claims are now pending:

> (1) Klicos' claim against Saffo for unjust enrichment,
>
> (2) Saffo's counter-claim for unjust enrichment, and
>
> (3) Saffo's counter-claim for intentional misrepresentation, including punitive damages.

This Court conducted a seven-day bench trial[2] from Monday, June 18, 2018 through Tuesday, June 26, 2018.

---

[2] Both parties requested a bench trial. (ECF Nos. 1, 111.)

4

# FINDINGS OF FACT

Having conducted that seven-day bench trial, heard eyewitness and expert witness testimony, and considered documentary evidence submitted by the parties, this Court makes the following findings of fact.

## I. Bid Preparation & Contract Award

In April 2013, the Maryland Transportation Authority ("MDTA") issued an Invitation for Bids ("IFB") for a contract, No. FT-2575-000-006, to repair and paint various bridges on I-95 and I-395 in south Baltimore City ("the 395 Project" or "the Project"). (Ex. 3.)[3] The MDTA conducted a "Pre-Bid Meeting" on April 25, 2013. (Ex. 5 at 41.) Bidding on the Project opened on May 16, 2013. (*Id.*)

Michael Ost, the head of Saffo's Bridge Maintenance Division, was in charge of preparing Saffo's bid. This process required a detailed analysis of the work required to complete the contract requirements. With respect to cleaning and painting certain portions of the bridges, Mr. Ost studied the structural plans and visited the actual work site for about three days. (Tr. at 421-22.)[4] Mr. Ost analyzed the square footage that would need to be painted and how difficult it would be to provide the laborers with safe access to all of the locations. (*Id.*) This analysis informed Mr. Ost's estimate of the total cost to Saffo of performing under the contract. (Ex. 161.) In consultation with Nicholas ("Nick") Saffo, the

---

[3] Before trial, the parties submitted a "Joint Exhibit List," which had been prepared in streamline fashion for convenience, but numerous exhibits still faced objections when presented. The numbering of trial exhibits remained consecutive regardless of which party offered the exhibit, but due to the contentious nature of numerous exhibits, this Court will simply refer to the trial exhibits as "Exhibits" in this Memorandum Opinion.

[4] The Trial Transcript has been broken out into seven volumes based on each day of trial and with continuous pagination. Volume I covers pages 1 through 229. Volume II covers pages 230 through 395. Volume III covers pages 396 through 616. Volume IV covers pages 617 through 771. Volume V covers pages 772 through 976. Volume VI covers pages 997 through 1168. Volume VII covers pages 1169 through 1282.

company's President, Mr. Ost determined how much profit to build into Saffo's bid. (Tr. at 423-24.) Mr. Ost identified $13,723,459.00 as Saffo's total bid price. (Ex. 4 at 18.)

Having identified the total bid price, Mr. Ost next allocated the total price across the various project milestones, or "items," identified in the Schedule of Prices attached to the IFB. (Ex. 3 at 209-24.) Rather than allocate prices based on square footage, Saffo decided to "front-load" the bid by assigning a higher price per square foot to the items that could be accomplished earlier in the Project. (Tr. at 435-36; Ex. 4 at 2-18.) Consistent with industry practice, this approach aims to keep contractors cash-flow-positive throughout the duration of a project. (Tr. at 436, 697-700.)

The MDTA also required bids to include two attachments regarding the involvement of Minority Business Enterprises ("MBEs") in the Project. (Ex. 3 at 3-5.) Saffo completed the required forms by identifying certain percentages of the overall bid price that would be paid to the following MBE subcontractors: Pioneer Contracting Company, Inc. ("Pioneer"); Masonry Resurfacing & Construction Co. Inc.; Jo-Lyn Services, Inc.; Batta Environmental Associates; Apex Petroleum Corporation; Acorn Supply & Distributing; and Atlantic Traffic Safety Inc. (Ex. 4 at 27-34.) In total, Saffo's bid-preparation efforts on the bid for the 395 Project took about two weeks (Tr. at 423), and Saffo submitted its bid on May 16, 2013. (Ex. 4 at 18.)

Later that same day, MDTA announced Blastech Enterprises ("Blastech") as the winning bidder. (Tr. at 438-440.) Not satisfied with such a result, Mr. Ost drove up to Maryland that evening to review Blastech's bid in person. (*Id.*) Mr. Ost discovered that Blastech had not complied with the MBE requirements, and he initiated a bid protest. (*Id.*)

The bid protest was successful, and MDTA ultimately awarded the contract to Saffo on July 29, 2013. (*Id.* at 440; Ex. 5 at 1.)

Klicos did not submit a bid on the Project. (Tr. at 151-52.) Mr. Ost and Mr. Saffo testified that Klicos did not assist in preparing Saffo's bid or in protesting the initial contract award. (Tr. at 424, 437-38, 877.) On the other hand, George Klicos, Mr. Saffo's cousin (Tr. at 143), testified that he "discussed the numbers" with Saffo and helped Saffo connect with Pioneer to meet the 4% participating threshold for Asian MBEs. (Tr. 58, 60-61.)[5] Despite his assertion that he discussed the numbers with Saffo, George Klicos was careful to testify that there were "never" any discussions about front-loading the contract to earn "easy money" from "easy bridges" earlier in the project. (Tr. at 99-100.)

This Court is not convinced by George Klicos' generalized assertion of having contributed to the bid by discussing the numbers with Saffo. Regarding the issue of Pioneer, the documentary evidence corroborates Klicos' testimony that, at the very least, Klicos helped Saffo to line up Pioneer as an MBE subcontractor. Specifically, Exhibit 121 contains an email conversation on May 15, 2013 between George Klicos and Mr. Ost in which Klicos provides a bid from Pioneer. (Ex. 121.) This email conversation occurred one day before Saffo submitted its bid featuring Pioneer as an MBE subcontractor. (Ex. 4 at 27.)

## II.    Contract Terms & Conditions

It is undisputed that the MDTA contract for the 395 Project was awarded to Saffo as the sole General Contractor. (Ex. 5 at 4.) Based on Saffo's bid, the total contract price was

---

[5] In addition to being cousins, Saffo and Klicos had successfully worked together on earlier projects. (Tr. at 144.)

$13,737,459.00. (*Id.* at 5.) The contract required that Saffo post a Performance Bond and Payment Bond, both in the amount of $13,737,459.00. (Ex. 5 at 9, 11, 19.)

The contract obligated Saffo to complete all work within 540 days of the issuance of the "Notice to Proceed." (*Id.* at 7.) Based on that timeframe, the contract contains the following liquidated damages provision:

> It is expressly understood and agreed that in the event of failure on the part of the Contractor, for any reason, except with the written consent of the MDT A, to complete the furnishing and delivery of the materials and the doing and performance of the work within the time period granted Five Hundred Fourty (540) calendar days the MDTA shall have the right to deduct from any monies due or which may become due from the Contractor, or, if no monies shall be, the MDTA shall have the right to recover the amount of One Thousand Seven Hundred Sixty Dollars ($1760.00) per day for each and every calendar day elapsing between the time stipulated for the completion and the actual date of completion, in accordance with the terms of this Contract; not as a penalty, but as liquidated damages. Provided, however, that upon receipt of written notice from the Contractor of the existence of causes over which the Contractor has no control and which must delay the completion of work, the MDTA may, at its discretion, extend the period specified for the completion of the work, and in such case the Contractor shall become liable for liquidated damages for delays commencing from the date on which the extended period shall expire.

(*Id.*) The contract also provides for various rates of liquidated damages for failure "to make good faith efforts to comply with the Minority Business Enterprise ('MBE') Program and contract provisions." (*Id.* at 8.)

The Schedule of Prices breaks the work down into categories. (*See id.* at 311-344.) Category 1, Items 1001 to 1014, covered preparatory operations, and Category 4, Items 4001 to 4060, covered the on-site repair, cleaning, and painting work. (*Id.*) The contract required

Saffo to clean and paint 46 bridge structures, as identified by Items 4001 to 4048[6] in the Schedule of Prices. (*Id.* at 311-344.) This work was subject to inspection and approval by MDTA. (*Id.* at 7.)

In terms of performance specifications, the contract explicitly incorporates the 2008 version of the "Standard Specifications for Construction and Materials" ("Standard Specifications") by the MDTA State Highway Administration. (Ex. 124.) Mr. Ost described this document as the "Bible" for this and other similar projects in Maryland. (Tr. at 445.)

Section 108 of the Standard Specifications governs "Mobilization," which is described as "preparatory operations that include the movement of personnel and equipment to the project site and the establishment of the Contractor's offices, buildings, and other facilities necessary to begin work." (Ex. 124 at 32.) "Materials" are "not applicable" under this category of work (*id.*), and fabricating materials does not constitute mobilization. (Tr. at 687.) According to the Standard Specifications, "[p]ayment of 50 percent of the Mobilization item will be made in the first monthly estimate after the Contractor has established the necessary facilities. The remaining 50 percent will be prorated and paid in equal amounts on each of the next five monthly estimates." (Ex. 124 at 32-33.) No further action is required after the first payment of 50% is approved. (Tr. at 457-58, 689-90.) The Mobilization Line Item is intended to cover all of the General Contractor's costs for mobilization, and is not limited to only the mobilization necessary for cleaning and painting. (*Id.* at 34.)

---

[6] Of the 48 line items, two are blank (Items 4003 and 4006). (Ex. 5 at 320, 322.)

Section 436 of the Standard Specifications governs "Cleaning and Painting Existing Structural Steel." (*Id.* at 34.) This section identifies the acceptable cleaning systems, paint systems, health and safety requirements, and Quality Control ("QC") procedures. The Contractor is required to provide various plans and drawings, known as "submittals," to the MDTA detailing how it will comply with all of these performance requirements. (*Id.* at 38.)

Another undisputed element of the MDTA contract is that "[t]he contractor shall be responsible for certifying and submitting to [Maryland Department of Labor, Licensing and Regulation ("DLLR")] all of their subcontractors' payroll records covering work performed directly at the work site." (*Prevailing Wage Instructions for the Contractor and Subcontractor*, Ex. 5 at 91.) This "certified payroll" requirement is intended to ensure the Contractor is complying with Maryland's wage and hour laws. (*Id.*; *see also* Tr. at 523.)

Payment for onsite cleaning and painting production work, however, was not based on certified payroll. Rather, the contract calls for "lump sum" payments for each bridge. (Ex. 5 at 311-344.) In practice, MDTA's onsite Project Engineer, Jason Smith, oversaw the inspection of the onsite work for the purpose of, *inter alia*, deciding when to make monthly lump sum "Progress Estimate" payments for the work completed. (Tr. at 692-96.) Multiple witnesses testified that this process involved some negotiation between Mr. Smith and Saffo's Project Superintendent, Greg Hahn, to determine what percentage of the work on each bridge had been completed according to the Standard Specifications. (*Id.* at 488 (Ost), 693-96 (Smith), and 786-87 (Hahn).)

### III. Preparations

#### A. Bonds

On July 19, 2013, Saffo, as the General Contractor, executed the required Performance Bond and Payment Bond, both in the amount of $13,737,459.00. (Ex. 5 at 11, 19.) Klicos provided no bonds for the Project and did not guarantee or participate in Saffo's bonds. (Tr. at 168-69.)

#### B. Saffo's Submittals

Saffo attended a pre-construction meeting with representatives of MDTA. (Tr. at 442-43.) Klicos did not attend the pre-construction meeting. (Tr. at 159-60, 443.) Following this meeting, the MDTA issued a Notice to Proceed, effective October 7, 2013, giving Saffo until on or about March 30, 2015 (540 calendar days later) to complete the contract or risk liquidated damages. (Tr. at 443-45.) Saffo prepared various schedules and engineering drawings detailing Saffo's project plans and submitted these plans to MDTA for review. (Exs. 11, 13, 14; Tr. at 446-47.) MDTA approved these "submittals" in December 2013 and January 2014. (Exs. 11, 13, 14.) Klicos had no involvement in preparing the original submittals. (Tr. at 160-64, 446-51.)

#### C. Mobilization by Saffo

Saffo mobilized onsite in December 2013 (Tr. at 451), and on December 12, 2013, Saffo sent a letter to MDTA requesting the initial 50% payment of Mobilization, Item 1011. (Exs. 10, 12.) In MDTA's Progress Estimate No. 1, which covered the period of October 7, 2013 to December 19, 2013, MDTA approved the first 50% payment of the Mobilization

line item, which came to $350,000.00. (Ex. 12.) Klicos had no involvement in Saffo's onsite mobilization in December 2013. (Tr. at 459-60.)

### D. Klicos' Off-site Pre-Production Work

Klicos was aware of the 395 Project before bidding opened (Ex. 5 at 41), and it engaged in negotiations to work as Saffo's cleaning and painting subcontractor. (Tr. at 57-58, 460-461, 878-879.)[7] It was not until March 18, 2014, however, that Saffo formally submitted a Contractor's Request for Approval of Subcontractor that listed Klicos Painting Company as a subcontractor for "Cleaning & Painting Services; Labor + Equipment." (Ex. 16.) In early 2014, after the original containment designs had been submitted and approved by Saffo, George Klicos began working with the David R. Schmidt Company to design additional containment systems for plate birders and joints on the 395 Project. (Tr. at 160-62, 450.) On or about March 18, 2014, Klicos had personnel on-site in Baltimore for a tour of the work-site. (Ex. 133; Tr. at 169.)

From January 29, 2013 through April 23, 2013, Klicos devoted 2,592.5 labor hours towards fabricating and transporting equipment for the job. (Ex. 146A; Tr. at 1059-1061.) Saffo paid Klicos at least $178,600.73 for the labor and materials involved in that effort. (Ex. 22; Tr. at 551-52.) Exhibit 22 contains Klicos Invoice 2, which George Klicos acknowledged was paid in full in a timely fashion (Tr. at 247) and which indicates that Klicos had already received payment for Invoice 1. (Ex. 22 at 3.) Klicos Invoice 2 is dated April 4, 2014 and therefore does not cover work performed between that date and April 23, 2014. Klicos

---

[7] This Court has already granted summary judgment in Saffo's favor on Klicos' breach of contract claim. (ECF Nos. 105-06, 122-23.)

Invoice 3, which would have presumably covered this time period, was never introduced at trial. The trial record therefore only establishes that Saffo paid Klicos $178,600.73 for pre-production work.

## IV. Cleaning & Painting Production

### A. Project Management

MDTA's on-site Project Engineer was Jason Smith. As an employee of Greenman-Pederson, Inc., Mr. Smith worked on behalf of MDTA to ensure that the work laid out in the contract for the 395 Project was completed according to the MDTA's quality standards. (Tr. at 678-79.) A team of inspectors reported to him on a daily basis, and he oversaw the work of all contractors on the Project. (*Id.* at 682, 694.) Mr. Smith held progress meetings at least once a month with Saffo and other subcontractors as needed. (*Id.* at 685.) Mr. Smith also decided how much MDTA would pay Saffo each month. (*Id.* at 694-696.)

Saffo's on-site Project Superintendent was Greg Hahn. He worked closely with Mr. Smith on a daily basis to manage all aspects of the 395 Project, which covered repair work in addition to cleaning and painting. (*Id.* at 819.) Carlos Gonzaga, a Saffo employee, supervised the cleaning and painting laborers on Saffo's payroll. (*Id.* at 482-83, 575, 986.) In terms of Saffo executives, Mr. Ost communicated with Jason Smith "regularly," and Nick Saffo communicated with Jason Smith "once in a while." (*Id.* at 681.)

Klicos' on-site Quality Control Supervisor was Tony Hatzileris. (*Id.* at 297-98.) He coordinated with Mr. Hahn on a daily basis to determine where to work and to respond to quality control issues. (*Id.* at 298-99, 988.) Tony Hatzileris was responsible for clocking in and clocking out the cleaning and painting laborers on the project. (*Id.* at 980-82, 989.) He

testified that he supervised the work of all painters "once they arrived on site, but their immediate supervisor after me would have been Mr. Hahn." (*Id.* at 300.) Mr. Hatzileris later admitted that Carlos Gonzaga supervised four of five Saffo employees. (*Id.* at 986.) Klicos also relied on "John T.Z." and Tony's brother, Mike Hatzileris, to supervise cleaners and painters working on-site. (*Id.* at 78.) George Klicos tracked Klicos' finances on the Project and, according to Jason Smith, visited the work site "a handful of times." (Tr. at 683.) Mr. Smith also testified that a Klicos representative participated in the progress meetings occasionally but not regularly. (*Id.* at 685-86.)

Jo-Lyn Services ("Jo-Lyn") was involved in the cleaning and painting work, but Jo-Lyn did not have a foreman or supervisor on-site. (*Id.* at 80-81.)

## B. Production Process

"Cleaning and painting" bridges for interstate highways is much more technical and risky than mere road maintenance. In short, cleaning old, rusted metal bridges is a difficult process. For the purpose of the 395 Project, Saffo broke the process down into the following six steps. (*See* Exs. 62, 214.)

1. Rigging: This step involves providing the laborers with access to the surfaces in need of cleaning and painting. Suspended scaffolding and platforms are frequently necessary to provide safe access to bridge surfaces high above the ground, water, or railways. (Tr. at 416, 476-77.)

2. Containment: Cleaning bridges of this sort may involve removing hazardous material, and "containment" refers to the temporary installation of an impenetrable barrier under negative pressure to protect the environment. (Tr. at 478.) In layman's terms, a tent encapsulates the area where workers are actively cleaning and painting. (Tr. at 701.) Failure to properly contain a work site could create significant environmental liability. (Tr. at 718.)

3. Blast and prime coat: Blasting is when the real "cleaning" takes place. On the 395 Project, the contractors propelled steel grit abrasive out of a nozzle at

high speed to remove rust and other imperfections from the surface of the steel. (Tr. at 481.) Shortly thereafter, the prime coat of paint has to be applied to the entire blasted surface to protect the steel and ensure the coating does not fail. (Tr. at 788.)

4. Stripe[8] and intermediate coat: The stripe coat is manually applied to hard-to-reach areas, such as corners and edges. The intermediate coat is applied to the entire surface with a spray application. (Tr. at 789.)

5. Finish coat: The finish coat is applied to the entire surface with spray application. (Tr. at 789.)

6. De-rigging and touch-up: This step refers to the removal of the rigging and containment systems followed by painting touch-ups to the locations where the rigging and containment systems came in contact with the surface of the bridge. (Tr. at 433.) This final step also involves some degree of environmental clean-up. (Tr. at 476.)

## C. Production Work Hours

From March 2014 through December 2014, a crew of 20 to 30 workers performed the tasks described above as part of Saffo's efforts to complete the cleaning and painting work on the 395 Project. (*Id.* at 183-84, 463.) Some were employed by Saffo; some were employed by Klicos; and some were employed by Jo-Lyn Services. (*Id.* at 182-83, 310, 463-64, 794-96.) Bridge painters are "free agents" who frequently move from one contractor to another, even among contractors on the same project. (*Id.* at 77, 567.) In this case, the precise breakdown of workers across the three contractors varied throughout the project. (*See* Ex. 136 at 43.)

The parties do not dispute that the companies' respective payroll records for *hourly* employees accurately presents (a) how many *hourly* employees worked for each contractor for each pay period and (b) how many hours those *hourly* employees worked. The final page of

---

[8] In certain portions of the transcript, "stripe" is recorded as "strike."

Exhibit 36 summarizes the parties' production work hours as found in Klicos' certified payroll records (Ex. 128), Saffo's certified payroll records (Ex. 125), and Saffo's business records of Jo-Lyn's hours (Ex. 129). (Ex. 136; Tr. at 520.) These records show that:

1. From April 20, 2014 to December 20, 2014, Klicos' hourly employees worked **15,628.35 hours** on the Project site (Exs. 128, 136);

2. From March 31, 2014 to December 21, 2014, Saffo's hourly employees worked **11,962.59 hours** on-site (Exs. 125, 136); and

3. From March 31, 2014 to December 21, 2014, Jo-Lyn's hourly employees worked **6,780 hours** on-site (Ex. 129).

Mr. Ost testified that Saffo employees performed most, if not all, of the rigging and containment (Tr. at 484), but the parties did not offer evidence as to how the thousands of hours of work were distributed across the various stages of the cleaning and painting process. Regarding Jo-Lyn's work, it is undisputed that Saffo paid Jo-Lyn to cover Jo-Lyn's payroll expenses for its hourly employees working on the 395 Project. (Tr. at 468-469, 797-800; Ex. 130.) Mr. Klicos testified that having an employee on payroll involved assuming certain risks, such as a worker's compensation claim for any injury. (Tr. at 183.)

Aside from the payroll records, additional evidence of the parties' respective production work was either non-existent or speculative. In attempting to establish the parties' respective production efforts, Saffo did not seek credit – by way of employee records or any other method of quantification – for cleaning and painting work performed by its management personnel, Messrs. Hahn, Ost, and Saffo. Klicos, on the other hand, sought to prove Tony Hatzileris' production work hours on the Project. Tony Hatzileris, as a salaried

employee, was not included in Klicos' certified payrolls submitted to the Prevailing Wage Unit of the Maryland Department of Labor, Licensing and Regulation. (Tr. at 632; Ex. 128.) As a rebuttal witness, Tony Hatzileris testified that during Klicos' onsite production work in 2014, he worked every week with the exception of a ten-day trip to Greece and national holidays. (Tr. at 983-84.) Tony Hatzileris testified that he generally worked at least 12 hours a day. (*Id.* at 985.) He testified about his twice-daily task of clocking employee hours, his general supervisory role, and his occasional driving of equipment around the worksite. (*Id.* at 980-85.)

Klicos, however, did not provide documentary evidence regarding Tony Hatzileris' work between his daily time-entry duties. Mr. Hatzileris mentioned his own "daily reports," but those reports were never introduced in evidence. (*Id.* at 988-89.) Nor did Tony Hatzileris aver that he devoted every single hour on-site to cleaning and painting production on the 395 Project. This Court cannot simply assume that *every* hour of a salaried employee's time on-site was focused on cleaning and painting production, and only speculation could support a finding of which *portion* of his hours was devoted to cleaning and painting production.

### D. Klicos' Performance Issues

In attacking the *value* of Klicos' work hours, Saffo elicited testimony as to deficiencies in the *quality* of Klicos' performance. Mr. Smith testified that remediation was needed on multiple occasions to fix Klicos' work, and he specifically criticized Mike Hatzileris' work, saying that "Mike would repetitively cross the line on what was allowed." (*Id.* at 708-09.) Mr. Hahn testified that he had to remove a Klicos employee who had painted his own name on a bridge, which required re-blasting and re-painting. (*Id.* at 792-94.) Mr. Hahn admitted,

however, that he could not reliably quantify the number of hours Saffo expended in remedying Klicos' performance issues. (*Id.* at 849.)

### E. Payments from MDTA to Saffo

On a monthly basis, MDTA's onsite supervisor, Mr. Smith, would meet with Saffo's onsite manager, Greg Hahn, to assess Saffo's progress on each item. Multiple witnesses testified that this process involved some negotiation between Mr. Smith and Mr. Hahn to determine what percentage of the work on each bridge had been completed. (Tr. at 488 (Ost), 693-96 (Smith), and 786-87 (Hahn).) This process involved a "give and take" and did not represent a direct measure of square footage of painting completed. (*Id.* at 695-96.) Mr. Smith would then approve a Progress Estimate payment to Saffo. (*Id.* at 488-90, 693-96.) Klicos had no involvement in this process. (*Id.* at 696.) Saffo deposited the Progress Estimate payments into its general operating account, from which it also paid project expenses. (*Id.* at 561-62.)

From April 2014 through December 2014, the general time period during which Klicos performed cleaning and painting work on-site, Saffo received nine (9) Progress Estimate payments, Progress Estimate No. 3 through Progress Estimate No. 11. (Exs. 23, 26, 31, 37, 40, 45. 49, 55, 61, 148.) Progress Estimate No. 3 covered the time period of March 20, 2014 through April 21, 2014 (Ex. 23), but Klicos did not have production laborers working on-site until April 23, 2014, the first day of on-site production work reported in its certified payroll (Ex. 128 at 124).

As of December 2014, MDTA had paid Saffo **$5,857,770.00** for cleaning and painting production work on the 395 Project. (Tr. at 97-99 (Stipulation).) Progress Estimate

No. 11, which compensates work through December 19, 2014, establishes that at least some work on 34 cleaning and painting line items had been completed by that date. (Ex. 61.)

### F.  Payments from Saffo to Klicos in 2014

From March 2014 through December 2014, Klicos submitted monthly invoices to Saffo, and Saffo paid all of them. (Exs. 21, 22, 30, 36, 39, 46, 52, 60, 114; Tr. at 236-47.) George Klicos testified that he would issue these invoices after having an initial discussion with "one of the Saffos," who was "occasionally" Tia Saffo, an owner and wife of Nick Saffo. (Tr. at 236-37, 865.)[9] In making his initial request, George Klicos would incorporate an analysis of the Project's current profitability, due in part to his *subjective* understanding that Saffo had agreed to pay Klicos 50% of the Project's profits. (*Id.* at 236, 284, 286.)

After issuing the negotiated invoices by email (Exs. 21, 22, 30, 36, 39, 46, 52, 60; Tr. at 236-47.), there were no disputes as to securing full and timely payment from Saffo. (*Id.* at 236-47.) The parties stipulated that Saffo paid Klicos a total of **$2,738,600.73** for Klicos' work on the 395-Project. (Tr. at 118-119 (Stipulation); *see also* Ex. 114.)

George Klicos' testimony about the payment process undermines any implicit assertion that he was unaware of Saffo's front-loading strategy on the Project. (*See* Tr. at 99-100.) Mr. Klicos' estimation of the Project's profits demonstrates that while he may not have discussed the front-loading strategy *directly* with Saffo (Tr. at 99-100), he was nonetheless aware of how the Project's profits were scheduled against the remaining work. In addition to tracking profits, Mr. Klicos' attempt to distinguish "less difficult" bridges from "easier"

---

[9] Mr. Klicos also testified that "most of the time" he would speak to Mike Ost in advance of sending the invoices. (Tr. at 282.)

bridges defies common understanding of the English language. (*Id.* at 99.) Mr. Klicos also demonstrated that he was familiar with how MDTA would pay lump sum prices for specific bridges based on the prices Saffo had allocated to the various structures (*Id.* at 101), and Mr. Klicos testified that he made a pre-bid visit to gauge the size and difficulty of all the bridges at issue (*Id.* at 59). Furthermore, MDTA's onsite Project Engineer, Jay Smith, provided an in-depth explanation of "front-loading a bid," demonstrating that this strategy is known in the industry. (*Id.* at 698-700.) This Court finds that this evidence, taken together, outweighs any implicit claim of ignorance by George Klicos regarding Saffo's strategy to generate more profits earlier in the Project.

## V.   Klicos' Work Stoppage & Promise to Return

### A.  Saffo Snubs Klicos in Texas Project

In late 2014, Mr. Klicos learned that Saffo was not going to include Klicos in a large project that Saffo had secured in Beaumont, Texas. (*Id.* at 256-67.) George Klicos believed that Saffo was going to include Klicos in the project (*id.* at 266-67), so Mr. Klicos felt that Saffo had "frozen" him out of the Texas project (*id.* at 268-70). Saffo's decision made him "upset" and "bothered." (*Id.* at 268.) Mr. Klicos initially claimed that "it wasn't the end of my world," but then admitted that "Texas is what you might say lit the fuse to this." (*Id.* at 269-70.) From late 2014 through March 2015, George Klicos continued to harbor frustration over Saffo's treatment of Klicos with respect to the Texas Project. (*Id.* at 270; Ex. 82.)

### B.  Offseason Painting Procedures

Winter painting is common in the industry. (Tr. at 254, 495-96, 713, 807-08.) As the 395 Project entered the later months of 2014, Saffo's Offseason Painting Procedure began to

guide Saffo's approach to scheduling work on the Project. (Ex. 13.) The Offseason Painting Procedure called for using direct-fire heaters at the beginning of the day to warm up the interior of the containment tents followed by indirect heaters to maintain the internal temperature during the day while paint coats were applied. (Tr. at 494-95.) This process would enable painting throughout the Baltimore winter, which would also coincide with fewer restrictions around Camden Yards and M&T Bank Stadium during the offseason for both the Orioles and Ravens. (*Id.* at 252; Ex. 67.) Based on these procedures, Mr. Smith and Mr. Hahn testified that there was no weather-related reason Klicos could not have worked in in the winter of 2014 to 2015. (Tr. at 713, 808.)

George Klicos testified that the Offseason Painting Procedure would "not work in the stadium parking lot," which involved tub girders rather than I-beams and which would be inappropriate for direct heaters. (*Id.* at 255.) Mr. Ost directly rebutted this testimony stating that that there was "nothing whatsoever" about the structures around the stadiums that would have made the Offseason Painting Procedure inapplicable. (*Id.* at 496.) This Court finds that Mr. Ost effectively rebutted George Klicos' assertion regarding the possibility of painting around the stadiums in the winter. First, Mr. Ost's testimony, on the whole, was more detailed than Mr. Klicos' testimony. For example, Mr. Ost's description of the heating involved both direct and indirect heat depending on the time of day and whether paint was actively being applied. (*Id.* at 494-95.) Second, Mr. Ost provided examples of other projects in Cecil County, Maryland and in Maine where Saffo worked in more challenging circumstances. (*Id.* at 495-96.) Furthermore, even if some structures were temporarily

unavailable, MDTA's Project Engineer, Mr. Smith, corroborated Mr. Ost's recollection that the Offseason Painting Procedures enabled painting throughout the winter (*Id.* at 713.)

### C. Klicos Leaves for the Winter

Based on the Offseason Painting Procedure, both Saffo and MDTA expected cleaning and painting to continue throughout the winter, with the exception of a holiday break from late December through early January. (*Id.* at 250, 491-92, 712-13.) Saffo and Klicos both stopped production work around mid-December to take a break for the holidays. (*Id.*) Saffo expected Klicos to return on January 9, 2015 (*id.* at 496), and George Klicos testified that Klicos intended to return sometime around January 8th, 9th, or 10th. (*Id.* at 250.) In fact, he testified that he told Tony Hatzileris to return in mid-January 2015. (*Id.*)

## VI. Klicos' Promise to Return

When Klicos did not return to the Project in mid-January as Saffo expected (Tr. at 496-97), Greg Hahn contacted Klicos repeatedly and requested that it return to the Project. (Exs. 67, 77; Tr. at 253, 498-99, 808-15.) Klicos refused to do so, and an email from George Klicos to Mike Ost on December 3, 2014 provides persuasive evidence of the reason why. In that email, Klicos states, "Spoke to Greg about Jan. Main problem is NO out of town guys are going to want to stay in Balto given that the work will be sporadi[c] due to winter weather." (Ex. 118 at 1; *see also* Tr. at 132-33.)

Tia Saffo testified that in February 2015, George Klicos called and said: "I need some money." (Tr. at 858.) He said he "wanted $200,000 to get his crew back up to Baltimore." (*Id.*) Ms. Saffo testified that she discussed the matter with Mr. Ost (*id.* at 500, 858), and they

decided that if Klicos was going to return to the Project immediately, Saffo would provide the additional $200,000. (*Id.* at 500.) Ms. Saffo testified that she had a second phone call with Mr. Klicos in which she told him that as long as Klicos "was coming back right away," Saffo would pay the $200,000. (*Id.* at 859.) Mr. Klicos responded: "Absolutely." (*Id.*) Ms. Saffo testified that based on that promise from Mr. Klicos, she agreed to pay the invoice to be sent by Klicos shortly thereafter. (*Id.* at 859.) Having observed their testimony at trial, this Court finds Tia Saffo to be highly credible. Specifically, it is abundantly clear to this Court that the $200,000 payment was made based upon the express promise of George Klicos to send workers to return to the Project immediately.

George Klicos emailed Tia Saffo on February 9, 2015 to request $200,000 of "available profit." (Ex. 73; Tr. at 129-133, 860-61.) On February 11, 2015, Mr. Klicos sent an invoice to Saffo for $200,000. (Ex. 74; Tr. at 131-32, 256-57.) On February 12, 2015, Mr. Klicos sent an email to Nicholas Saffo and Gregory Hahn stating: "Sending crew up next week." (Ex. 77; Tr. at 257.)

The next day, on February 13, 2015, Saffo issued a payment to Klicos in the amount of $200,000. (Ex. 114; Tr. at 258.)[10] Ms. Saffo testified that, notwithstanding the Klicos' "profit" label in the February 9th email, she agreed to make payment based solely on Klicos' promise to return to work "right away." (Tr. at 861.) In other words, both she and Mike Ost testified that if Saffo had known that Klicos was not going to return to the Project, it would not have paid the requested $200,000. (Tr. at 501, 859-860.)

---

[10] The parties agree that this $200,000 payment in 2015 is included in the stipulated total amount of $2,738,600.73 Saffo paid to Klicos on the Project. (Tr. at 1201, 1232.)

Despite the promise to return "next week" – as documented in the email on February 12, 2015 – Klicos did not send up a crew the following week. (Tr. at 258.) Rather, Mr. Klicos testified that he sent Mike Hatzileris, Tony Hatzileris, John TZ, and Sophia Patellis back to the work-site in "late February." (*Id.* at 258, 274.) Mr. Klicos was immediately impeached at trial on this claim by Klicos' own internal payroll records showing that only Tony and Mike[11] Hatzileris received payments for work on the 395 Project during the month of February. (*Id.*; Ex. 216 at 30.) Additionally, Tony Hatzileris testified that only he and John TZ returned in March 2015. (Tr. at 314-15.) Furthermore, Klicos' certified payroll submission to the DLLR for hourly employees on the 395 Project does not cover *any* work in 2015. (Ex. 128.) This Court finds that Klicos did not return to the work-site until March 3, 2015, the date of an MDTA Inspector's Daily Report indicating that Klicos had 2 men on-site and stating that "Klico[s] was organizing equip[ment] & material in Annapolis [S]t. yard." (Ex. 81.) While Klicos was in contact with some Baltimore-based painters, Klicos did not employ them to perform cleaning and painting work on the 395 Project in 2015. (Tr. at 260-61.) Based on this evidence, this Court finds that Klicos' on-site work in March 2015 was aimed at preparing Klicos' equipment to leave Project.

George Klicos' testimony also challenges Ms. Saffo's account of his promise to return in exchange for $200,000. First, Mr. Klicos testified that he was not asked by Tia Saffo to make a promise that Klicos would return to the 395-Project "immediately" in exchange for payment of the $200,000 and that he did not make such a promise. (*Id.* at 129-133.) Second, George Klicos testified that on February 9, 2015, Klicos intended to send Klicos employees

---

[11] Mike Hatzileris is listed as "Kominos" in the Klicos records. (Tr. at 289)

back to the 395 Project, "but the weather kept us from sending them back."(*Id.* at 134, 250.)[12]

This Court does not find either of Mr. Klicos' contentions credible. As a general matter, Mr. Klicos' testimony lacked credibility. George Klicos's testimony was contradicted by that of his own employee, Tony Hatzileris, regarding (a) whether Mr. Klicos had instructed Mr. Hatzileris to return to the Project in January (*compare* Tr. at 250-51 *with* Tr. at 313-14), (b) whether Klicos used employees from other projects (*compare* Tr. at 189-90 *with* Tr. at 312-13), (c) which Klicos employees returned to the Project in March 2015 (*compare* Tr. at 258, 274 *with* Tr. at 314-15), and (d) whether Klicos' foreman, Mike Hatzileris, can read and write the English language (*compare* Tr. at 155-56 *with* Tr. at 304). Mr. Klicos' testimony was also questioned by MDTA's Project Engineer Jason Smith, an unbiased third-party to this suit, regarding Tony Hatzileris' "regular" attendance at project meetings (*compare* Tr. at 171-72 *with* Tr. at 685-86) and the nature and frequency of Klicos' performance (*compare* Tr. at 186-87 *with* Tr. at 708, 711-12). Finally, Mr. Klicos' own testimony equivocated on (a) whether Baltimore-based painters ever returned to work in 2015 (*compare* Tr. 134 *with* Tr. at 260-61), (b) whether Klicos managed all the painting labor (Tr. at 185), and (c) who was responsible for calculating "piecework" bonuses for Klicos employees (*id.* at 233-34).

---

[12] In its Proposed Findings of Fact and Conclusions of Law, Klicos contends that "Mr. Klicos testified that there was no telephone call between him and Tia Saffo on or about February 9, 2015." (ECF No. 158 at 6 ¶13 (citing Tr. at 129/24-133).) This purported testimony, however, does not appear in the record. Rather, Mr. Klicos admitted that he had discussions with "Saffo representatives" before sending the $200,000 invoice. (Tr. at 131-32.) Conducting such a pre-invoice conversation is consistent with the parties' usual practice, which involved speaking to "one of the Saffos" and emailing most invoices directly to Tia Saffo. (*Id.* at 236-47, 865; Exs. 21, 22, 30, 36, 39, 46, 52, 60.) To the extent the *occurrence* of the conversation with Tia Saffo is in dispute, this Court first finds that George Klicos spoke to Tia Saffo on or about February 9, 2015.

Turning to the substance of Mr. Klicos' negotiations with Saffo, Mr. Klicos' own email on February 12, 2015 reflects a promise to return "next week" and an indication that Klicos "w[as] planning on coming up this week." (Ex. 77; Tr. at 257; see also Ex. 118 (stating that a "[n]umber of guys will be coming up" next week).) Based on Tia Saffo's credible testimony, Mr. Klicos' lack of credibility, and Mr. Klicos' email reiterating a promise to return either "this week" or "next," this Court finds that Mr. Klicos promised to return to the work-site within a week of February 12, 2015. (Exs. 73, 74, 77.)

This Court further finds that Mr. Klicos intended that promise to induce Saffo to pay the $200,000 requested in his emails on February 9th and February 11th. (Exs. 73, 74.) Klicos testified that – rather than compensate Klicos' efforts to return on-site within a week – the $200,000 was to be paid pursuant to his own *subjective* understanding of an ongoing agreement to split the Project profits 50-50 (Tr. at 129-33.) First, this Court held at summary judgment that Klicos failed to establish such an agreement existed. (ECF Nos. 105-06, 122-23.) Second, it defies logic that in mid-February 2015, almost two months after Klicos left the job-site (Tr. at 287-88; Exs. 128, 136) and a month after Saffo had expected Klicos to return (Tr. at 496), Saffo would agree to disburse profits. Mr. Klicos knew, through repeated contact over the prior month (*see* Exs. 67, 77, 118; Tr. at 253, 498-99, 808-15), that Saffo wanted Klicos to return immediately. Promising to meet that demand was therefore intended to induce the $200,000 payment in February 2015.

This Court also finds that Klicos never intended to honor the promise. At the time of the promise, Mr. Klicos was harboring intense frustration with Saffo due to having been denied participation in the Texas project. (*Id.* at 268-270; Ex. 82.) Indeed, Mr. Klicos

conceded in his pre-trial deposition that **"Texas is what you might say lit the fuse to this."** (*Id.* at 269-70.) This statement was a striking admission by Mr. Klicos. Lit fuses result in some form of fiery destruction, and Mr. Klicos intended to receive payment from Saffo on the 395 Project even as Klicos' relationship with Saffo fell apart. Mr. Klicos' testimony as to his intent to have his workers return during that winter is not credible. For example, he testified that he told Tony Hatzileris to return in January, but Hatzileris testified that Mr. Klicos never gave him that instruction. (*Compare* Tr. at 250-51 *with* Tr. at 313-14.)

Mr. Klicos' own statements contain partial truths regarding his state of mind during this time period. In an email on December 3, 2014, Klicos states, "Spoke to Greg about Jan. Main problem is NO out of town guys are going to want to stay in Balto given that the work will be sporadi[c] due to winter weather." (Ex. 118 at 1; *see also* Tr. at 132-33.) Mr. Klicos also testified that he was "not going to spend money to send people up there to do nothing. I would pay people to sit here and do nothing." (Tr. at 133.) This Court credits (a) Mr. Klicos' concern that Florida-based painters would not want to work during the winter and (b) his desire to avoid spending money to send the painters up to Baltimore, but the Court rejects that the weather precluded cleaning and painting in January and February. As this Court has already found, the Offseason Painting Procedure enabled cleaning and painting on the 395 Project throughout the winter. Mr. Klicos' complaints about the weather masked his true intent, namely to seek additional payments while preventing Saffo from discovering that he never intended to bring his painters back to work.

## VII.    Project Completion

On March 9, 2015, George Klicos sent an email to his cousin Nick Saffo listing various grievances. (Ex. 82.) One of Mr. Klicos' concerns was that Saffo was using the 395 Project to fund other projects. (*Id.*) Mr. Klicos admitted that this concern was due in part to Saffo's exclusion of Klicos on the Texas project. (Tr. at 270, 294.) On March 10th and 12th, Klicos sought an additional payment of $345,000, along with other demands. (Exs. 85, 92; Tr. at 502- 08.)

On or about March 12, 2015, Mr. Klicos spoke, in a "hostile" tone, with Tia and Nick Saffo on a conference call. (Tr. at 142, 862.) Mr. Klicos testified that the Saffos refused to pay Klicos any more money on the Project. (Tr. at 142.) On the other hand, both Tia and Nick Saffo testified that, while they refused Klicos' *immediate* demand for the $345,000, Saffo did not tell Klicos that no *future* payments would ever be made. (Tr. at 884-85, 861-62.) Both indicated that Saffo was open to making future payments if Klicos returned to work. (*Id.*) Consistent with this Court's prior credibility determinations, the Court finds that the Saffo's account of this conversation is accurate.

To Saffo's surprise, Klicos then removed equipment and left the Project permanently. (Tr. at 273, 508-09, 816.) After Klicos left the job, Saffo brought additional workers and continued work on the Project. (Tr. at 509-10, 714-15.) On October 9, 2015, MDTA terminated the Contract for convenience. (Ex. 104; Tr. at 510.)[13] While the work had continued past March 2015, the original deadline for liquidated damages, Saffo did not

---

[13] Mike Ost testified that this was the only time that a government agency has terminated a Saffo contract for convenience. (Tr. at 510.)

introduce any evidence of liquidated damages imposed by MDTA. Rather, Saffo and MDTA engaged in negotiations for settlement payments based on the early termination and other delays. (*See* Ex. 104 at 2; Tr. at 107-114, 525.)

MDTA's total payment for the cleaning and painting line items under the contract came to $7,640,000.00. (Ex. 147; Tr. at 1080, 1084.) Saffo's accounting expert in the construction industry, Jeffrey Willoughby, testified that if costs are to be disregarded, the completion is measured by units of production, which would be square footage under a bridge painting contract. (Tr. at 1123.) Mr. Anthony Ardito, an accounting expert originally retained by Klicos but called by Saffo, agreed that the unit of production is an acceptable accounting method. (Tr. at 1102-03.) Under that measure, the total production of cleaning and painting work completed under the contract came to 414,253 square feet. (Ex. 147.) As of December 2014, when Klicos completed its production work, the parties had completed cleaning and painting of 280,426 square feet. (Ex. 147; Tr. at 1079.) Thus, as of that date, the parties had completed 67.69% of the square footage completed under the contract. (Ex. 147; Tr. at 1078-79.)

## CONCLUSIONS OF LAW

As set forth on the record at the bench-trial, the parties agree that the Court's resolution of the $200,000 at issue in Saffo's intentional misrepresentation claim would alter the value calculations in the parties' competing claims of unjust enrichment (Tr. at 1201, 1232), so the Court will address the intentional misrepresentation claim first.

## I. Intentional Misrepresentation

Under Maryland law, the tort of intentional misrepresentation[14] has the following five elements.

> (1) That the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. *Md. Envtl. Trust v. Gaynor*, 370 Md. 89, 803 A.2d 512, 516 (Md. 2002).

*On Site Pers., LLC v. C-Care, LLC*, JFM-13-03700, 2015 WL 2129685, *13 (D. Md. May 6, 2015) (Motz, J.); *see also* MPJI-Cv 11:1. These five elements must be proven by clear and convincing evidence. *Md. Envtl. Trust*, 370 Md. at 97; *see also* MPJI-Cv 1:15.

"The failure to perform a promise does not establish fraudulent intent." *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md. App. 97, 149, 838 A.2d 404, 435 (2003). Rather, a promise constitutes "false representation" if the person did not intend to do the promised act when the promise was made. *Tufts v. Poore*, 219 Md. 1, 147 A.2d 717 (1959); *see also First Union*, 154 Md. App. at 134, 838 A.2d at 427; MPJI-Cv 11:3. "In evaluating circumstantial evidence of fraudulent intent, courts consider the subsequent conduct of the promisor, changes of circumstances occurring after the allegedly false representation, and other circumstances surrounding the transaction." *First Union*, 154 Md. App. at 149, 838 A.2d at 434; *accord. Dynacorp Ltd. v. Aramtel Ltd.*, 208 Md. App. 403, 453, 56 A.3d 631, 660-61 (Md. Ct. Spec. App. 2012).

---

[14] This tort also goes by the names of "fraud" or "deceit." *B.N. v. K.K.*, 312 Md. 135, 149, 538 A.2d 1175, 1182 (1988).

## A. Klicos Intentionally Deceived Saffo

George Klicos' promise to return within a week of February 12, 2015 was a "false representation" because, at the time of the promise, he did not intend to return in that timeframe. Proving an opponent's fraudulent intent under this standard is no small task, but George Klicos made a striking admission when he testified that "Texas is what you might say lit the fuse to this." (*Id.* at 269-70.) Having learned of Saffo's decision to exclude Klicos from the Texas project in late 2014, Klicos was motivated to intentionally deceive Saffo on the 395 Project in retaliation. He knew the 395 Project was front-loaded for early profits, and he used the winter weather to disguise his plan to get out of the Project before Saffo required Klicos to complete the more difficult and less profitable work. As this Court observed above, Mr. Klicos lacked credibility regarding weather-related restrictions as well as Klicos' intent and actual work in 2015. George Klicos was undermined by his own employees, the MDTA Project Engineer, and his own statements about Klicos' consistent lack of interest in sending painters to the work-site. On the other hand, Tia Saffo was corroborated by her colleagues, Mr. Klicos' own documentation of the promise, and his agitation at not being included in the Texas project. As a principal of Klicos Painting Company, Mr. Klicos had all the knowledge and control necessary to be sure that his intentions would be carried out.

Mr. Klicos' intent to break his own promise also satisfies the second element: knowledge of the statement's falsity. As to the third element, Mr. Klicos made this false promise to defraud Saffo. Specifically, he made the promise to Saffo's financial manager, Tia Saffo, in order to induce her to pay Klicos $200,000 for work it never intended to perform.

31

Saffo made clear it needed Klicos on-site, and Klicos said he "wanted $200,000 to get his crew back up to Baltimore." Klicos knew that a promise to return within a week would loosen Saffo's purse strings, and he was motivated to defraud to Saffo based on the Texas project.

Tia Saffo and Mike Ost both credibly testified that they agreed to make the $200,000 payment based on Klicos' promise to return to work right away. (Tr. at 501, 859-861.) Both were justified in relying on Mr. Klicos' promise as the two companies had successfully worked together on multiple projects before and because Mr. Klicos and Mr. Saffo were cousins. (Tr. at 143-44.) Finally, due to its reliance on Klicos' false representation, Saffo sustained $200,000 in actual damages, the amount paid to Klicos on February 13, 2015, just days after the fraudulent promise was made.

### B. Punitive damages

Saffo also seeks punitive damages in an amount left to the discretion of this Court. Under Maryland law, an award of punitive damages is appropriate if the defendant acted with "actual malice," which is "conscious and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud." *Bowden v. Caldor, Inc.*, 350 Md. 4, 23, 710 A.2d 267, 276 (1998) (internal quotation marks omitted). In the case of a claim for intentional misrepresentation, "the defendant's actual knowledge of falsity, coupled with his intent to deceive the plaintiff by means of the false statement, constitutes the actual malice required to support an award of punitive damages." *Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 234, 652 A.2d 1117, 1126 (1995); *see* MPJI-Cv 10:15. Again, this state of mind must be proven by clear and convincing evidence. *Scott v. Jenkins*, 345 Md. 21, 29, 690 A.2d 1000 (1997).

George Klicos had more than reckless indifference towards the truth of his own promise. As the promisor who, by virtue of his position with the company, had sufficient control to ensure that the promise was intentionally never fulfilled, George Klicos had "knowledge of [the] falsity" of the representation. *Ellerin*, 337 Md. at 234, 652 A.2d at 1126. Saffo had been consistently asking for that very promise for a month, and Klicos expected and intended that Saffo would rely on his false promise to return. This Court therefore finds that punitive damages are justified in this case.

Saffo has not sought a specific amount of punitive damages, but this Court finds that $50,000 sufficiently sanctions Klicos' conduct. Punitive damages should aim to "deter the wrongdoer and others from engaging in the same misconduct." *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.*, 88 Md. App. 672, 596 A.2d 687 (Ct. Spec. App. 1991), *cert. denied*, 323 Md. 1, 590 A.2d 158 (1991) (subsequent history omitted); *see also* MPJI-Cv 10:14. The amount should also be calibrated "to the gravity of the defendant's conduct" and should "not be disproportionate to . . . the defendant's ability to pay." *Bowden v. Caldor, Inc.,* 350 Md. 4, 27–28, 710 A.2d 267, 278 (1998) (quoting *Ellerin*, 337 Md. at 242, 652 A.2d at 1130). This Court finds that punitive damages in the amount of $50,000 will achieve these objectives.

## II.    Unjust Enrichment

Under Maryland law, the elements of unjust enrichment are as follows:

1. A benefit conferred upon the defendant by the plaintiff;

2. An appreciation or knowledge by the defendant of the benefit; and

3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit

without the payment of its value.

*Alternatives Unlimited, Inc. v. New Baltimore City Bd. of Sch. Comm'rs*, 155 Md. App. 415, 496, 843 A.2d 252, 300 (Md. Ct. Spec. App. 2004); *accord. Hill v. Cross Country Settlements*, LLC, 402 Md. 281, 295, 936 A.2d 343, 351 (2007); *see also* MPJI-Cv 9:32. In the case of a contract implied at law, the "measure of recovery is the gain to the defendant, not the loss by the plaintiff." *Alternatives Unlimited,* 155 Md. App. at 485. The proper amount of restitution need not be calculated with "mathematical certainty." *Jackson v. 2109 Brandywine, LLC,* 180 Md. App. 535, 575-76, 952 A.2d 304, 328 (2008).

In this case, the parties' competing unjust enrichment claims are two sides of the same coin. The overlapping nature of the claims led Judge Motz of this Court to earlier observe that "the operative question will be whether the actual value realized by Saffo for Klicos's work is more or less than $2,738,600.73." (ECF No. 105 at 10.) This Court also held that the amount due to Klicos "is measured by 'the actual value realized by the defendant,' and not the market value of the plaintiff's services rendered." (*Id.* at 9 (citing *Dolan v. McQuaide*, 215 Md. App. 24, 38 (2013)).) In ruling on a motion in limine, this Court reiterated that market value is not a concern when "services were the effective catalyst for a quantifiable gain." (ECF No. 136 at 11 (quoting *Slick v. Reinecker*, 154 Md. App. 312, 337, 839 A.2d 784, 799 (Md. Ct. Spec. App. 2002)).) In this case, Klicos' on-site cleaning and painting work was to a certain degree "the effective catalyst for a quantifiable gain," namely the payments from MDTA to Saffo. (ECF No. 136 at 12.) With some tweaks based on evidence at trial, this framework will guide the Court's analysis of whether either party has been unjustly enriched.

## A. Actual Value Realized by Saffo

Saffo, as the General Contractor on the 395 Project, engaged Klicos as a subcontractor to perform cleaning and painting work as required under Saffo's contract with the MDTA. By completing work on-site, Klicos enabled Saffo to get paid by MDTA according to the contract and the accompanying Schedule of Prices.

At trial, Klicos attempted to prove that it contributed to Saffo's receipt of payments for "Mobilization." According to the Standard Specifications, "[p]ayment of 50 percent of the Mobilization item will be made in the first monthly estimate after the Contractor has established the necessary facilities. The remaining 50 percent will be prorated and paid in equal amounts on each of the next five monthly estimates." (Ex. 124 at 32-33.) No further action is required after the first payment of 50% is approved. (Tr. at 457-58, 689-90.) Additionally, "materials" are "not applicable" under this category of work (Ex. 124 at 32), and fabricating materials does not constitute mobilization (Tr. at 687).

Saffo mobilized onsite in December 2013, and on December 12, 2013, Saffo sent a letter (Ex. 10) to MDTA requesting the initial 50% payment of the Mobilization line item. (Tr. at 451.) In MDTA's Progress Estimate No. 1, MDTA approved the first 50% payment of the Mobilization line item, which came to $350,000.00. (Ex. 12.) Klicos had no involvement in Saffo's onsite mobilization in December 2013. (Tr. at 459-60.) Any preparatory efforts by Klicos therefore did not result in any quantifiable gain to Saffo because MDTA had already approved and begun issuing payments for the Mobilization line item of the Contract. In this unjust enrichment context, Klicos' off-site preparatory work

constitutes a cost to Klicos that does not measure the actual value realized by Saffo. *Alternatives Unlimited,* 155 Md. App. at 485.

Under *Alternatives Unlimited,* 155 Md. App. at 485, and *Slick*, 154 Md. App. at 337, this Court's task is to determine what portion of the payments from MDTA is attributable to Klicos' on-site cleaning and painting production work. MDTA paid Saffo $7,640,000.00 for all cleaning and painting completed under the contract (Ex. 147; Tr. at 1080, 1084), and it paid $5,857,770.00 for cleaning and painting production work during Klicos' time on the 395 Project (Tr. at 97-99 (Stipulation)). As an initial matter, a portion of the MDTA payments received during Klicos' time on the Project is attributable to Saffo's decision to front-load the Schedule of Prices. This strategy involves assigning higher prices to work that would be completed earlier in the project. The goal is to keep the Project cash-flow positive, but this approach comes with back-end risks should the later work prove even more difficult than expected.[15]

In order to give Saffo credit for selecting this strategy, along with its attendant risks, this Court must select a starting value that accounts for the higher profits assigned to earlier work. Based on the expert accounting testimony of Mr. Ardito and Mr. Willoughby (Tr. at 1102-06, 1123), the best method for identifying that amount in this case is to have the starting value reflect the percentage of square footage completed with Klicos' help compared to the total square footage completed on under contract. Saffo initially requested a comparison to the total square footage *contemplated* under the contract, but this Court finds

---

[15] Furthermore, Klicos was aware that the earlier work had higher profit margins and it left the Project before the more difficult work came due.

that such an approach would over-compensate Saffo, especially when it negotiated a settlement with MDTA for the early termination of the contract. Mr. Ardito questioned whether the unit of production method, based on square footage, is applicable to the damages context, but this Court finds that such an opinion in a case for unjust enrichment is a legal conclusion more properly committed to the discretion of this Court. This Court finds that the unit of production method will help this Court determine how much credit Saffo is owed for its front-loading strategy.

As of December 2014, the parties had completed cleaning and painting of 280,426 square feet. (Ex. 147; Tr. at 1079.) The total square footage of cleaning and painting completed under the contract came to 414,253 square feet. (Ex. 147.) Thus, while Klicos was on the job, the parties completed 67.69% of the square footage completed under the contract. (Ex. 147; Tr. at 1078-79.) MDTA's total payment for the cleaning and painting line items under the contract came to $7,640,000.00. (Ex. 147; Tr. at 1080, 1084.) Taking 67.69% of $7,640,000.00 amounts to $5,171,850.63. (Ex. 147.) To give Saffo credit for its decision to use a front-loading strategy, and thereby even out the revenue per square foot, this Court will use **$5,171,850.63** as the starting point for analyzing the parties' respective production efforts in 2014.

To analyze the parties' production efforts, this Court will use the parties' respective on-site production work hours. This approach properly accounts for the fact that the cleaning and painting process involves important on-site work before and after paint is actually applied to the bridges. Specifically, both parties contributed to the rigging, containment, and clean-up work required under the contract. Square footage is inappropriate

in this context because MDTA did not pay based on strict square footage measurements (Tr. at 695-96.), and neither party even attempted to quantify the square footage of paint applied by its own painters. In order to compare the parties' on-site production work hours, Exhibit 136 provides a very clear picture of the parties' respective efforts.

Exhibit 136 summarizes the parties' production hours based on payroll records. Klicos' hourly employees worked **15,628.35 hours** on the Project site. (Exs. 128, 136.) Saffo's hourly employees worked **11,962.59 hours** on-site. (Exs. 125, 136.) Jo-Lyn's hourly employees worked **6,780 hours** on-site. (Ex. 129.) While salaried employees for Saffo and Klicos may have devoted additional hours to cleaning and painting production, Saffo did not offer any evidence of such hours. Klicos offered Tony Hatzileris' testimony regarding his on-site work, but Klicos' minimal evidentiary submission, untethered to any documentary evidence, calls for speculation by this Court. Furthermore, Klicos' own proposed formula does not offer any quantification of Tony Hatzileris' contribution to on-site production. (*See* ECF No. 158 at 14.)

Klicos initially sought credit for Jo-Lyn's work hours, but as this Court held during trial, it is undisputed that Jo-Lyn was a subcontractor to Saffo, who paid Jo-Lyn's payroll costs. (Tr. at 468-469, 797-800; Ex. 130.) Additionally, the laborers were "free agents" (Tr. at 77, 567), and Klicos only shouldered the employment and liability risks for the employees on its own payroll (Tr. at 183). Any payments from Klicos to Jo-Lyn would therefore constitute costs to Klicos rather than a benefit to Saffo. Klicos essentially asks this Court to simply wave a wand to place Saffo's subcontractor Jo-Lyn, its employees, and their work under Klicos' umbrella. This Court sees no basis to do so.

Comparing the parties' on-site production hours, Klicos contributed about **45.47%**[16] of the cleaning and painting production. Taking 45.47% of the $5,171,850.63 amounts to **$2,351,622.96.** (Ex. 147 (utilizing the exact fraction rather than rounded 45.47%).)[17]

## B. Saffo's Payment to Klicos

The parties stipulated that Saffo paid Klicos a total of $2,738,600.73 for Klicos' work on the 395-Project (Tr. at 118-119 (Stipulation); *see also* Ex. 114), but two deductions from this amount are necessary to reflect the value Saffo conferred on Klicos for the purpose of any unjust enrichment claim. First, the parties agreed that the $200,000 at issue in the intentional misrepresentation claim are included in the stipulated total amount of $2,738,600.73 Saffo paid to Klicos on the Project. (Tr. at 1201, 1232.) As this Court has already found that Klicos must return the $200,000 as actual damages for Saffo's intentional misrepresentation claim, that amount must be deducted from the $2,738,600.73 to avoid double recovery by Saffo.

Additionally, a portion of the $2,738,600.73 compensated Klicos for off-site pre-production work. From January 29, 2013 through April 23, 2013, Klicos devoted 2,592.5 labor hours towards fabricating and transporting equipment for the job (Ex. 146A; Tr. at 1059-1061), and Saffo paid Klicos $178,600.73 for those efforts. (Ex. 22; Tr. at 551-552.) This Court has already held that Klicos' pre-production work did not catalyze the

---

[16] The exact fraction is 0.4546966128944975.

[17] During trial this Court held that Klicos had no viable theory of unjust enrichment as to Saffo's settlements with the MDTA for the early termination and other delays. (*See* Tr. at 347-52.) To reiterate, Klicos played no role in causing the MDTA to make those payments to Saffo, so it cannot claim that any portion of those payments constitute unjust enrichment retained by Saffo. Klicos essentially seeks compensation for costs it incurred, but any such costs are irrelevant under *Alternatives Unlimited, Inc. v. New Baltimore City Bd. of Sch. Comm'rs*, 155 Md. App. 415, 485 (Md. Ct. Spec. App. 2004).

mobilization payments by MDTA, and that the relevant benefit conferred by Klicos is its on-site cleaning and production work, not preparatory costs. It would be unfair, or inapposite, for the Court to compare the benefit to Saffo of Klicos' on-site cleaning and painting production work *alone* with the benefit to Klicos of Saffo's payments for *both* on-site and off-site work. Such an approach would tip the scales in favor of Saffo's unjust enrichment claim. (*See* Tr. at 1061 (testimony by construction damages expert Scott Lowe regarding a deduction of the pre-production work in order to match MDTA revenue to labor hours).) In other words, the $178,600.73 emerges as a side bargain not encompassed by the unjust enrichment claim related to MDTA's payment for cleaning and painting production. While Saffo may have used MDTA's mobilization payments to fund this side bargain, Klicos did not cause or catalyze the mobilization payments. This Court cannot say that the exchange of $178,600.73 for Klicos' off-site pre-production work was unjust in any way, but the Court must deduct $178,600.73 in order to ensure a comparison of apples to apples.

With these two deductions, the benefit conferred by Saffo upon Klicos for the cleaning and painting work amounts to **$2,360,000.00**. When compared to the benefit conferred by Klicos upon Saffo, **$2,351,622.96**, the amount of unjust enrichment retained by Klicos comes to **$8,377.04**.

## CONCLUSION

Having conducted a seven-day bench trial from June 18, 2018 through June 26, 2018, heard eyewitness and expert witness testimony, considered documentary evidence submitted by the parties, heard the parties' legal arguments, and reviewed the parties' Proposed Findings of Fact and Conclusions of Law, this Court concludes as follows.

1. Klicos intentionally misrepresented its intent to return to the 395 Project in 2015, which caused Saffo to incur $200,000 in actual damages. Punitive damages are warranted in the amount of **$50,000.**

2. Klicos retains **$8,377.04** in unjust enrichment based upon Saffo's overpayment for the actual value to Saffo of Klicos' work on the 395 Project. This amount incorporates a deduction for a refund of the $200,000 fraudulently obtained by Klicos.

3. Judgment shall be ENTERED in favor of Saffo on its intentional misrepresentation claim and on the parties' competing claims of unjust enrichment.

4. Klicos SHALL PAY to Saffo a total of **$58,377.04**.

A separate order follows.

July 16, 2018                    _____/s/_____

                                 Richard D. Bennett
                                 United States District Judge